UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) GOTBIT CONSULTING LLC,<br>(2) ALEKSEI ANDRIUNIN,<br>  a/k/a "Alex Andryunin,"<br>(3) FEDOR KEDROV, and<br>(4) QAWI JALILI, a/k/a "Kavi JLL",<br><br>    Defendants. | ) Criminal No. 24-CR-10190-AK<br>)<br>) Violations:<br>)<br>) Count One:<br>) Conspiracy to Commit<br>) Market Manipulation and Wire Fraud<br>) (18 U.S.C. § 371)<br>)<br>) Counts Two – Three:<br>) Wire Fraud<br>) (18 U.S.C. § 1343)<br>)<br>) Forfeiture Allegation:<br>) (18 U.S.C. § 981(a)(1)(C) and<br>) 28 U.S.C. § 2461) |

SUPERSEDING INDICTMENT

At all times relevant to this Superseding Indictment:

General Allegations

1.   Defendant GOTBIT CONSULTING LLC ("GOTBIT") was a company registered in Belize. GOTBIT operated both inside and outside the United States. GOTBIT had a public website ("https://gotbit.io/") on which it purported to offer "market making" services for cryptocurrencies, such as the active monitoring of cryptocurrency trading and price fluctuations, trading in cryptocurrencies to capitalize on price fluctuations, and related consulting services. GOTBIT received client payments using its cryptocurrency wallets, including the wallet address ending in 052E3 (the "GOTBIT Wallet").

2.   Defendant ALEKSEI ANDRIUNIN, also known as "Alex Andryunin" ("ANDRIUNIN") lived in Russia and Portugal and was the Founder and Chief Executive Officer of GOTBIT.

3.    Defendant FEDOR KEDROV ("KEDROV") lived in Russia and worked for GOTBIT as the Director of Market Making.

4.    Defendant QAWI JALILI ("JALILI"), also known as Kavi JLL, lived in Russia and worked for GOTBIT as the Director of Sales.

5.    Co-conspirator 1 ("CC 1"), Co-conspirator 2 ("CC 2"), Co-conspirator 3 ("CC 3"), and Co-conspirator 4 ("CC 4") were individuals who worked at GOTBIT.

6.    Russell Armand ("Armand") was an individual who lived in Texas and who was involved in the creation and promotion of various cryptocurrency ventures, including Saitama LLC.

7.    Nam Tran ("Tran") was an individual who lived in Washington State and who was involved in the creation and promotion of one or more cryptocurrency ventures, including Saitama LLC.

8.    Manpreet Kohli ("Kohli") was an individual who lived in the United Kingdom and who was involved in the creation and promotion of one or more cryptocurrency ventures, including Saitama LLC.

9.    Vy Pham ("Pham") was an individual who lived in California and who was involved in the creation and promotion of various cryptocurrency ventures, including Robo Inu Finance.

10.    Co-conspirator 5 ("CC 5") was an individual who lived in Australia and who was involved in the creation and promotion of the Robo Inu cryptocurrency.

11.    Co-conspirator 6 ("CC 6") was an individual who lived in an unknown location and who was involved in the creation and promotion of the Robo Inu cryptocurrency.

12.  Saitama LLC ("Saitama") was a cryptocurrency company that was incorporated in Massachusetts on or about August 24, 2021. Saitama promoted a cryptocurrency token that operated on the Ethereum blockchain (the "Saitama Token"). The Saitama Token was a security that at its peak had a market capitalization of approximately $7.5 billion. Saitama also promoted the SaitaRealty real estate investment platform and the SaitaRealty cryptocurrency token.

13.  Robo Inu Finance ("Robo Inu") was a cryptocurrency company created in or about 2022. Robo Inu promoted a cryptocurrency token that operated on the Ethereum blockchain (the "Robo Inu Token"). Robo Inu purported to create multiple products that could be used with the Robo Inu Token, including the RoboNFT Marketplace and the RoboEx cryptocurrency exchange. The Robo Inu Token was a security.

Background

14.  Virtual currency is a digital asset or digital representation of value that can be electronically traded and exchanged online. Virtual currency is not backed or insured by a central bank and its value may or may not be tied to or secured by a fixed asset. Cryptocurrency is a subset of virtual currency that utilizes blockchain technology. Like many fiat currencies, many cryptocurrencies have a fluctuating, market-based value.

15.  Ethereum is a well-known blockchain that can be used to create different cryptocurrencies, which are referred to in the cryptocurrency community as "tokens." Each Ethereum-based token has its own coding (or "smart contract") that governs how the token operates. Tokens built using the Ethereum blockchain are fungible, meaning they can be exchanged for other Ethereum-based tokens.

16. Cryptocurrency can be stored in a cryptocurrency "wallet" located, for example, in an electronic storage device, in a cloud-based server, or on a cryptocurrency exchange. Cryptocurrency transactions can be made between wallets.

17. Cryptocurrency "exchanges" are digital marketplaces where individuals can purchase or trade cryptocurrencies. During the relevant period, Uniswap, BitMart, XT.com, and LBank were cryptocurrency exchanges that were available to the public, including to individuals in the United States.

18. CoinMarketCap was a publicly available website that aggregated and published information from cryptocurrency exchanges, including the trading prices and daily trading volume of various cryptocurrencies. The CoinMarketCap website also published a list of "trending" cryptocurrencies that was based, in part, on the cryptocurrencies' trading price and daily trading volume.

## Overview of the Conspiracy and Scheme to Defraud

19. Beginning at least in or about 2018 and continuing through in or about June 2024, GOTBIT, ANDRIUNIN, KEDROV, JALILI, CC 1, CC 2, CC 3, CC 4, and others known and unknown to the Grand Jury conspired to manipulate the trading volume and price of various cryptocurrencies in order to profit through payments from cryptocurrency companies and from the sale of those cryptocurrencies at inflated prices.

## Objects and Purpose of the Conspiracy and Scheme to Defraud

20. The objects of the conspiracy and of the scheme to defraud were to commit market manipulation and wire fraud. The principal purpose of the conspiracy and of the scheme to defraud was for the conspirators to enrich themselves.

Manner and Means of the Conspiracy and the Scheme to Defraud

21.     Among the manner and means by which GOTBIT, ANDRIUNIN, KEDROV, JALILI, CC 1, CC 2, CC 3, CC 4, and others known and unknown to the Grand Jury carried out the conspiracy and scheme to defraud were the following:

   a. Advertising purportedly legitimate services on GOTBIT's public website while privately offering clients illegal services that included market manipulation;

   b. Engaging in manipulative trades to artificially increase the trading price and volume of cryptocurrencies for the purpose of inducing others to buy them;

   c. Soliciting cryptocurrency exchanges to reduce their trading fees in order to engage in manipulative trading of cryptocurrencies at a lower cost;

   d. Soliciting investors to buy cryptocurrencies through online marketing and messaging applications;

   e. Selling cryptocurrencies for a profit, including at artificially inflated prices;

   f. Obtaining additional profits through payments from cryptocurrency companies into the GOTBIT Wallet; and

   g. Using multiple cryptocurrency wallets to promote GOTBIT's market manipulation services and conceal the source of GOTBIT's profits.

Overview of ANDRIUNIN's Management of the Conspiracy and Scheme to Defraud

22.     Beginning in at least in or about 2018, ANDRIUNIN actively managed GOTBIT, directed its market manipulation and fraud scheme, and promoted GOTBIT through online advertising. For example:

23.     ANDRIUNIN gave interviews promoting GOTBIT, including a 2019 interview posted on YouTube in which ANDRIUNIN described how he started GOTBIT after developing a

"trading system" to artificially inflate trading volume for cryptocurrencies with the purpose of getting those cryptocurrencies listed on CoinMarketCap and trading on larger cryptocurrency exchanges. ANDRIUNIN explained that he created an algorithm that inflated trading volume by entering a buy order from one account while simultaneously entering a sell order from another account, thus describing how wash trades deceptively created the appearance of increased trading activity. ANDRIUNIN described how GOTBIT used multiple accounts to create fake trading volume while avoiding detection.

24.     ANDRIUNIN caused GOTBIT to register as a limited liability company in Belize in or about April 2021 and to list ANDRIUNIN as GOTBIT's sole owner.

25.     ANDRIUNIN also used his social media presence to promote GOTBIT, recruit GOTBIT employees, and advertise to prospective GOTBIT clients.

26.     ANDRIUNIN participated in Telegram chatrooms with other GOTBIT employees to discuss the trading of various cryptocurrencies, including Telegram chatrooms named "Gotbit core" and "Gotbit Trading."

27.     ANDRIUNIN regularly held meetings with GOTBIT employees to discuss "Gotbit Goals" and to obtain a "Weekly Summary" of GOTBIT's operations, including meetings with KEDROV and JALILI.

28.     ANDRIUNIN exchanged GOTBIT business records with GOTBIT employees, including KEDROV and JALILI, and maintained those records through a cloud service provider. These records contained information about GOTBIT employees' assignments to various GOTBIT cryptocurrency company clients, as well as data from as early as 2018 about the "Created Volume" that GOTBIT generated through wash trades for certain clients and the "fees" paid to GOTBIT for those illicit services.

29. ANDRIUNIN caused millions of dollars of GOTBIT proceeds to be transferred from the GOTBIT Wallet to ANDRIUNIN's personal Binance account and then transferred those proceeds to other cryptocurrency wallets that GOTBIT, ANDRIUNIN, and others controlled.

Additional Overt Acts in Furtherance of the Conspiracy and Scheme to Defraud

30. On or about various dates between in or about 2022 and in or about 2024, GOTBIT, ANDRIUNIN, KEDROV, JALILI, CC 1, CC 2, CC 3, and CC 4, together with others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy and the scheme to defraud:

*Market Manipulation of the Robo Inu Token*

31. On or about February 12, 2022, CC 5 created a private chatroom that included Pham, KEDROV, JALILI, CC 1, CC 2, CC 3, CC 4, CC 5, and CC 6 on Telegram, an encrypted, cloud-based messaging service. CCG named the chatroom "Robo + Gotbit."

32. On or about February 25, 2022, Pham sent a message to the Robo + Gotbit chatroom asking GOTBIT to "slowly increase the volume", so that the Robo Inu Token would be "trending on cmc [CoinMarketCap]".

33. CC 3 responded, "Yeah we can increase more volume gradually but it is important that our market looks organic."

34. On or about December 27, 2022, JALILI scheduled an online meeting with ANDRIUNIN to discuss GOTBIT's operations.

35. Beginning in at least in or about 2023, ANDRIUNIN maintained GOTBIT records listing "Robo Inu" as a GOTBIT client.

36. On or about January 15, 2023, after CC 6 sent a message to the Robo + Gotbit chatroom asking GOTBIT to "get more vol on Bitmart please! Like 150-200k[,]" CC 2 responded, "I just changed the settings of our algorithm, it makes about 160k volume per day now."

37. Later on or about that same day, traders for GOTBIT engaged in manipulative trading that increased the daily trading volume of the Robo Inu Token to a value of more than $160,000.

38. On or about January 16, 2023, in response to a message from CC 6 directing GOTBIT to "raise the volume on Bitmart please, above 1.1mil daily," KEDROV responded, "Sure, will be done."

39. Later that same day, CC 2 replied by warning against raising the trading volume so dramatically, because it would risk revealing their scheme. CC2 wrote: "Yesterday I already raised volume above 120k, I suggest not to put 1.1 million at once, and raise it step by step … this has to be done because CMC itself can detect suspicious activity in the market and exclude volumes from bitmart."Between on or about March 6, 2023 and on or about March 7, 2023, CC 2 and Pham exchanged the following messages, among others, in the Robo + Gotbit chatroom:

   a. Pham asked, "How much and how long will it take for us to raise the volume on bitmart to 1mil?"

   b. CC 2 responded, "I can do it in 6 hours, it will cost about $200."

   c. Pham asked, "Can we start now?"

   d. CC 2 responded, "Okay, starting then" and later stated, "Volumes are in progress, 330k already done."

   e. Pham stated, "It just got trended a few hours ago" and "please make sure we have 1mil volume for the next 24 hours or so."

    f.    CC 3 responded, "Yea of course."

40.    On or about March 6, 2024, traders for GOTBIT engaged in manipulative trading that increased the daily trading volume of the Robo Inu Token to a value of more than $1 million, which, in part, caused the Robo Inu Token to start "trending" on Coin Market Cap.

41.    On or about May 21, 2023, after Pham sent a message to the Robo + Gotbit chatroom stating, "Pls increase the volume to 1mil[,]" traders for GOTBIT increased the daily trading volume of the Robo Inu Token from a value of approximately $100,000 to a value of more than $1.4 million.

42.    On or about May 22, 2023, CC 2 sent a message to the Robo + Gotbit chatroom stating that GOTBIT "met your volume target, right now the volume for the last 24 hours on Bitmart is $1.5M."

43.    On or about May 23, 2023, in response to the daily trading volume of the Robo Inu Token falling back below $1 million, Pham sent a message to the Robo + Gotbit chatroom directing GOTBIT to increase the daily trading volume back to over $1 million, to which CC 2 responded, "sorry for that" and "[l]et me increase it back fast."

44.    Later on or about May 24, 2023, traders for GOTBIT increased the daily trading volume of the Robo Inu Token to more than $1.2 million.

45.    On or about May 24, 2024, Pham, JALILI, and CC 4 had a video teleconference to discuss GOTBIT's "market making" services. During the conversation:

    a.    Pham asked, "Are you able to raise that volume ya know, over 1 million [. . .] using your experience [to] make it look organic?"

    b.    CC 4 responded, "Yes that's definitely something we can achieve" and "it's very cheap to maintain the volume above even 1 million on Bitmart. However, my

      recommendation is of course to have it fluctuating, sometimes having it go below" to "make it look more naturally appearing."

    c. Pham then said, "the basic goal right now is to create that FOMO [fear of missing out] by looking as organic volume."

    d. JALILI responded, "yea" and then stated, "we have good connections with Bitmart [. . .] I'll text one of the contacts that I have there."

    e. Pham then requested an "official agreement" from GOTBIT that described the "trading activity" GOTBIT would provide.

    f. JALILI agreed to send a contract but also said that certain countries are "kinda regulated [. . .] so that is why if you're looking for having more detailed agreements [. . .] we're not going to be having those things very clearly stated."

46. After the teleconference, on or about May 27, 2024, JALILI provided Pham a document entitled, "Market Maker Agreement" between "Gotbit Consulting LLC" and "Robo Global Investment Pte Ltd." Pursuant to the agreement, GOTBIT agreed to provide the following "services" (among others):

    a. "[T]rading volume system and liquidity system on the Exchanges in order to fulfill the minimum trading volume requirements of the Exchanges (the 'Trading Volume Requirements')."

    a. "The Trading Volume Requirements shall be communicated by Client to the Marker Maker."

    b. "The Market Maker agrees that it is solely responsible for fulfilling the Trading Volume Requirements."

   c. "The Market Maker acknowledges that its ability to continue as a market maker is dependent upon its ability to meet or exceed the Trading Volume Requirements and will allocate the necessary resources and take all reasonable measures to achieve the Trading Volume Requirements as agreed upon with the Client."

   d. "The Fee shall not be due for months where the Market Maker fails to meet the Trading Volume Requirements."

  47. The "Market Maker Agreement" identified GOTBIT's fees in exchange for these services, which included:

   a. "15,000 USDT shall be paid upon signing the agreement covering 3 months of MM support on 1 exchange."

   b. "2% of the token liquidation generated by the Market Maker."

   c. "20% of the net profit generated by the Market Maker."

  48. On or about May 30, 2024, Pham created a private chatroom that included Pham, JALILI, KEDROV, and others on Telegram. Pham named the chatroom "RBIF Gotbit".

  49. On or about that same day, Pham, JALILI, and KEDROV exchanged the following messages, among others, on the RBIF Gotbit chatroom:

   a. Pham asked JALILI, and KEDROV whether Gotbit could engaged in further manipulative trading to boost the trading volume of Robo Inu. Pham said: "Last time you guys helped us to get over 1mil dollars of trading volume on bitmart to create hype and fomo [fear of missing out] so can we do it again with this contract when the trading starts on bitmart and even possible to maintain throughout the trading on bitmart?"

      b. JALILI responded, "Ofc [of course] its possible we can hit 1m in volume on bitmart."

      c. KEDROV responded, "Confirm, but we need to keep in mind trading fees every exchange have" and "I would recommend to sync volume with marketing activities."

      d. KEDROV further warned against creating too much volume, to avoid discovery of their scheme: "1m volume on Bitmart is too high for organic activity, we recommend to keep less volume to show it more organic."

50. On or about June 3, 2024, GOTBIT sent Pham a copy of the Market Maker Agreement signed by ANDRIUNIN.

51. On or about June 4, 2024, JALILI created a private Telegram chatroom named "Robo Inu x bitmart" that included JALILI, Pham, and a representative from the Bitmart cryptocurrency exchange.

52. On or about June 6, 2024, Pham, KEDROV, and others had a video teleconference during which KEDROV confirmed that GOTBIT's "market making service" reflected in the Market Maker Agreement included GOTBIT's ability to "push the price" and "increase the volume" on cryptocurrency exchanges.

*Market Manipulation of the Saitama Token*

53. Beginning in or about 2023, KEDROV, CC 1, CC 2, CC 3, Tran, Kholi, and Armand communicated with representatives of LBank using a private Telegram chatroom (the "LBank chatroom") and with representatives of XT.com using another private Telegram chatroom (the "XT.com chatroom").

54. On or about March 17, 2023, Tran sent a message to the LBank chatroom identifying KEDROV, CC 1, CC 2, and CC 3 as the "new MM [market maker] team."

55. On or about March 30, 2023, CC 2 sent a message to the LBank chatroom stating that GOTBIT had obtained three accounts on the LBank cryptocurrency exchange that were not subject to trading fees.

56. On or about April 29, 2023, in response to a message from a representative from LBank that "our risk control found that your trading volume is too high" and "please reduce the trading volume under 200k ASAP", CC 3 responded, "[w]e already decreased our volume but it will take some time to make the daily volume figure go down" and "I think result will be noticeable in about 6 hours."

57. On or about June 6, 2023, in response to a message from a representative from LBank that Saitama needed to "increase the trading volume at least 10k usdt per day[,]" Tran sent a message to the LBank chatroom stating, "Okay" and "let me check with mm [market maker]".

58. On or about November 15, 2023, CC 3 sent a message to the XT.com chatroom stating, "I'm from Gotbit and we're preparing accounts for MM [market marking] on XT" and then identified three trading accounts on the XT.com cryptocurrency exchange that were controlled by GOTBIT.

59. On or about November 16, 2023, Tran sent a Telegram message to the XT.com chatroom requesting that XT.com "check on the reduce fee so we can make greater volume and attract more users / investors to XT." Tran said, "we are bringing more users and bring more volume to the platform."

60. On or about November 16 and November 17, 2023, traders for GOTBIT engaged in manipulative trading to increase the trading volume of the Saitama Token on XT.com.

13

<u>COUNT ONE</u>
Conspiracy To Commit Market Manipulation and Wire Fraud
(18 U.S.C. § 371)

The Grand Jury charges:

61. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 60 of this Indictment.

62. Beginning in at least in or about 2018 and continuing through in or about June 2024, in the District of Massachusetts and elsewhere, the defendants,

(1) GOTBIT CONSULTING LLC,
(2) ALEKSEI ANDRIUNIN, a/k/a "Alex Andryunin,"
(3) FEDOR KEDROV, and
(4) QAWI JALILI, a/k/a "Kavi JLL,"

conspired with CC 1, CC 2, CC 3, CC 4, and others known and unknown to the Grand Jury to:

a. commit market manipulation, that is, knowingly and willfully, by the use of the mails and any means and instrumentality of interstate commerce, directly and indirectly to effect a series of transactions in securities registered on a national securities exchange, and securities not so registered, to create actual and apparent active trading in such securities, and to raise and depress the price of such securities, for the purpose of inducing the purchase and sale of such securities by others, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff(a); and

b. commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce,

writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO – THREE
## Wire Fraud
## (18 U.S.C. § 1343)

The Grand Jury further charges:

63. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 60 of this Indictment.

64. In or about May 2024 and in or about June 2024, in the District of Massachusetts and elsewhere, the defendants,

(1) GOTBIT CONSULTING LLC,
(2) ALEKSEI ANDRIUNIN, a/k/a "Alex Andryunin,"
(3) FEDOR KEDROV, and
(4) QAWI JALILI, a/k/a "Kavi JLL,"

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|---|---|---|
| 2 | May 24, 2024 | Teleconference between JALILI, a GOTBIT employee located outside Massachusetts, and Pham, located inside Massachusetts, and others, to discuss artificially inflating the trading volume of the Robo Inu Token through manipulative trading. |
| 3 | June 6, 2024 | Teleconference between KEDROV, a GOTBIT employee located outside Massachusetts, and Pham, located inside Massachusetts, and others to discuss artificially inflating the price and trading volume of the Robo Inu Token through manipulative trading. |

All in violation of Title 18, United State Code, Section 1343.

## FORFEITURE ALLEGATION
(18. U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

65. Upon conviction of one of more of the offenses in violation of Title 18, United States Code, Section 371, relating to conspiracy to commit wire fraud and market manipulation (as set forth in Count One), and Title 18, United States Code, Section 1343, relating to wire fraud (as set forth in Counts Two and Three), the defendants,

(1) GOTBIT CONSULTING LLC,
(2) ALEKSEI ANDRIUNIN, a/k/a "Alex Andryunin,"
(3) FEDOR KEDROV, and
(4) QAWI JALILI, a/k/a "Kavi JLL",

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

66. If any of the property described in Paragraph 65, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants –

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 65 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

_____
CHRISTOPHER J. MARKHAM
DAVID M. HOLCOMB
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: __10/31__, 2024
Returned into the District Court by the Grand Jurors and filed.

/s/Thomas F. Quinn  10/31/24 @ 2:35pm.
DEPUTY CLERK